# UNITED STATES DISTRICT COURT
## NORTHERN DISTRICT OF OHIO
### EASTERN DIVISION

| | | |
|---|---|---|
| STEVEN BURSON, | ) | CASE NO. 5:08CV2251 |
| | ) | |
| PLAINTIFF, | ) | JUDGE SARA LIOI |
| | ) | |
| vs. | ) | |
| | ) | MEMORANDUM OPINION |
| | ) | |
| | ) | |
| VIKING FORGE CORPORATION, | ) | |
| | ) | |
| | ) | |
| DEFENDANT. | ) | |

The matter is before the Court upon the motion of defendant Viking Forge Corporation (defendant or Viking Forge) for summary judgment (Doc. No. 35) on all claims set forth in the Complaint of Steven Burson (plaintiff or Burson). Plaintiff also seeks partial summary judgment on the issues of liability and the availability of liquidated damages. (Doc. No. 37.) For the reasons that follow, plaintiff's motion is **DENIED** and defendant's motion is **GRANTED**.

## I.        Background

Plaintiff is a former employee of Viking Forge. The company operates a forging plant in Streetsboro, Ohio, where heavy presses are used to stamp billets (cylinders) of heated steel for use as components in the manufacturing of trucks, automobiles, and motorcycles. (Doc. No. 35, Ex. A, Burson Dep. 12-13; Ex. D, Verlihay Decl. ¶ 2.) The company is separated into five departments: engineering, quality assurance, maintenance, shipping, and, the department at issue in the present case, forging. (Doc. No. 35, Ex. B, Verlihay Dep. 7-9.)

The forge presses are operated by laborers known as "press operators." Plaintiff began his employment with Viking Forge as a press operator in 1999, first as a temporary employee, and later, as a permanent employee. (Burson Dep. 9.) Each shift has a shift supervisor, who oversees the activity of the shift and is responsible for the shift's operations. (Burson Dep. 109.)

In 2006, Viking Forge was operating on a three-shift schedule. Plaintiff was working on the third-shift, and his shift supervisor was John Koontz. Due to production demands, and a desire by management to ensure that each employee could have at least one day off every seven days, the company decided to transition to a four-shift schedule.[1] (Doc. No. 35, Ex. B, Verlihay Dep. 15.) The extra shift allowed the company to expand its operations, and run shifts twenty-four hours a day, seven days a week, with two day and two night shifts. (*Id.*)

The addition of the fourth shift also necessitated that the company select an individual to serve as shift supervisor for the new shift. Thomas Verlihay, Operators Manager, believed that plaintiff was the "logical choice." (*Id.*) Plaintiff assumed the role of shift supervisor of the fourth shift, known as the Yellow Team (also called D shift), on April 30, 2006. (Burson Dep. 11, 18.) The Yellow Team fell into the staggered schedule, as one of the two 12-hour night shifts.[2]

Upon his promotion, plaintiff joined Koontz, Jim Jenkins, and Roger

---

[1] Under this new approach, employees on each shift were scheduled in ten day increments as follows: three days on, two days off, two days on, and three days off. (*Id.*)
[2] The Yellow Team (or D shift) was scheduled from 7:00 pm to 7:00 am. (Burson Dep. 20.)

Hicks as shift supervisors.[3] (*Id*. 18-20.) Viking Forge classified the position of shift supervisor as exempt under the FLSA and, consistent with this classification, plaintiff's three co-shift supervisors were paid on a salary basis. (Doc. No. 35, Ex. C, Tauscher Dep. 58.) Plaintiff, however, remained an hourly worker, earning overtime for all time worked in excess of forty (40) hours per week, until January 29, 2007. According to defendant, the delay in switching plaintiff from hourly pay to salary was occasioned by the fact that Viking Forge was unsure whether plaintiff would be able to make the transition from laborer to supervisor. Because plaintiff had no previous supervisory experience and the company was concerned that it might have to return him to his position as a press operator, the decision was made to keep plaintiff hourly until it was known if the supervisor role was a good fit. (Tauscher Dep. 41-42.) After eight months in the role, defendant determined that the fit was good, and plaintiff's pay was converted to a straight salary. (Tauscher Dep. 43; Burson Dep. 91.)

Plaintiff insists that the decision to change his pay from hourly to salary was not motivated by any concerns regarding his lack of supervisory experience, but rather was the result of his own request that he be paid on a salary basis. (Doc. No. 37, Pl. Opp. Br. at 14.) Regardless of the impetuous, it is undisputed that plaintiff performed the same duties as a shift supervisor both during the time he was paid an hourly wage (with the right to overtime compensation) and after he was paid a straight salary. It is also beyond dispute that from April, 2006, until he left Viking Forge on March 18, 2008,

---

[3] When Roger Hicks eventually retired, Shannon Overall replaced him as shift supervisor of the other night shift.

3

plaintiff performed the same job duties as the other three shift supervisors who were paid a salary and classified as exempt under the FLSA.

Following his departure from Viking Forge, plaintiff filed the present putative class action suit to recover lost wages under the Fair Labor Standards Act (FLSA), 29 U.S.C. § 216(b), and the Ohio Minimum Wage Act (OMWA), Ohio Rev. Code § 4111.03. (Doc. No. 2, Complaint.) Plaintiff alleges that defendant unlawfully designated plaintiff, and others similarly situated, as exempt and subsequently refused to provide federally mandated overtime pay. (Compl. ¶ 30 (a) and (b).) While notice of this action was given to other present and past employees who had served as shift supervisors and had been classified as exempt employees of Viking Forge, no other individuals elected to join the class.

In its motion for summary judgment, defendant maintains that the position of shift supervisor is properly classified as "exempt" under the FLSA because it meets the qualifications for the executive exemption under 29 C.F.R. § 541.100. As such, defendant insists that it was not obligated to pay plaintiff overtime while he held that position. Plaintiff also seeks partial summary judgment, claiming that defendant has failed to meet its burden of proving every element of the executive exemption, and arguing that the evidence demonstrates a level of willfulness on the part of defendant that he believes entitles him to liquidated damages. Because the motions share common core arguments that are dispositive to the present dispute, the Court will address both motions together.

## II.        Standard of Review

Federal Rule of Civil Procedure 56(c) governs summary judgment motions and provides:

4

>The judgment sought shall be rendered forthwith if the pleadings, depositions, answers to interrogatories, and admissions on file, together with the affidavits, if any, show that there is no genuine issue as to any material fact and that the moving party is entitled to a judgment as a matter of law. […]

Rule 56(e) specifies the materials properly submitted in connection with a motion for summary judgment:

>Supporting and opposing affidavits shall be made on personal knowledge, shall set forth such facts as would be admissible in evidence, and shall show affirmatively that the affiant is competent to testify to the matters stated therein. […] The court may permit affidavits to be supplemented or opposed by depositions, answers to interrogatories, or further affidavits. When a motion for summary judgment is made and supported as provided in this rule, an adverse party may not rest upon the mere allegations or denial of the adverse party's pleading, but the adverse party's response, by affidavits or as otherwise provided in this rule, must set forth specific facts showing that there is a genuine issue for trial. If the adverse party does not so respond, summary judgment, if appropriate, shall be entered against the adverse party.

However, the movant is not required to file affidavits or other similar materials negating a claim on which its opponent bears the burden of proof, so long as the movant relies upon the absence of the essential element in the pleadings, depositions, answers to interrogatories, and admissions on file. *Celotex Corp. v. Catrett*, 477 U.S. 317 (1986).

In reviewing summary judgment motions, this Court must view the evidence in a light most favorable to the non-moving party to determine whether a genuine issue of material fact exists. *Adickes v. S.H. Kress & Co.*, 398 U.S. 144 (1970); *White v. Turfway Park Racing Ass'n*., 909 F.2d 941, 943-44 (6th Cir. 1990). A fact is "material" only if its resolution will affect the outcome of the lawsuit. *Anderson v. Liberty Lobby, Inc.*, 477 U.S. 242, 248 (1986).  Determination of whether a factual issue is "genuine" requires consideration of the applicable evidentiary standards. Thus, in most

civil cases the Court must decide "whether reasonable jurors could find by a preponderance of the evidence that the [non-moving party] is entitled to a verdict." *Id*. at 252.

Summary judgment is appropriate whenever the non-moving party fails to make a showing sufficient to establish the existence of an element essential to that party's case and on which that party will bear the burden of proof at trial. *Celotex*, 477 U.S. at 322. Moreover, "the trial court no longer has a duty to search the entire record to establish that it is bereft of a genuine issue of material fact." *Street v. J.C. Bradford & Co.*, 886 F.2d 1472, 1479-80 (6th Cir. 1989) (citing *Frito-Lay, Inc. v. Willoughby*, 863 F.2d 1029, 1034 (D.C. Cir. 1988)). The non-moving party is under an affirmative duty to point out specific facts in the record as it has been established which create a genuine issue of material fact. *Fulson v. Columbus*, 801 F. Supp. 1, 4 (S.D. Ohio 1992). The non-movant must show more than a scintilla of evidence to overcome summary judgment; it is not enough for the non-moving party to show that there is some metaphysical doubt as to material facts. *Id*.

FLSA overtime exemptions are "affirmative defense[s] on which the employer has the burden of proof," *Corning Glass Works v. Brennan*, 417 U.S. 188, 196-97 (1974), and those exemptions "are to be narrowly construed against the employers seeking to assert them." *Arnold v. Ben Kanowsky, Inc*., 361 U.S. 388, 392 (1960). *See Thomas v. Speedway SuperAmerica, LLC*, 506 F.3d 496, 501 (6th Cir. 2007). The Sixth Circuit has further observed that an employer "must establish through 'clear and affirmative evidence' that the employee meets every requirement of an exemption.'" *Ale*

6

*v. TVA*, 269 F.3d 680, 691 n.4 (6th Cir. 2001) (quoting *Roney v. United States*, 790 F. Supp. 23, 26 (D.D.C. 1992)).

While plaintiff is correct in noting that the burden of proof has shifted to defendant to establish each element of the exemption and the employee is entitled to summary judgment if the employer fails to create a genuine issue of material fact as to each element, *see Martin v. Ind. Mich. Power Co.*, 381 F.3d 574, 579 (6th Cir. 2004), "the employer claiming an FLSA exemption does not bear any heightened evidentiary burden." *Thomas*, 506 F.3d at 502-03. In *Renfro v. Ind. Mich. Power Co.*, 497 F.3d 573, 576 (6th Cir. 2007), the court explained:

> We clarify here that the phrase "clear and affirmative evidence" does not heighten [the defendant's] evidentiary burden when moving for summary judgment. The word "clear," as used in this phrase, traces to the "clearly erroneous" Rule 52(a) standard, but the standard is inapposite to our current review of a motion for summary judgment. And because establishing the applicability of an FLSA exemption is an affirmative defense, [the defendant] has the burden to establish the … elements by a preponderance of the evidence.

## III.        Law and Analysis

Generally under the FLSA, any employee who works more than forty (40) hours in a workweek must receive overtime compensation. *See* 29 U.S.C. § 207(a)(1). However, an employer need not pay overtime if the employee is "employed in a bona fide executive, administrative, or professional capacity" as defined by regulations or promulgated by the Secretary of Labor. *See* 29 U.S.C. § 213(a)(1).

Valley Forge asserts that plaintiff, as a shift supervisor, was an "executive

employee" exempt under the FLSA.[4] The Department of Labor regulations, as amended in 2004, provide that an employee qualifies for the executive exemption if the employee: (1) is paid a salary not less than $455.00 per week; (2) has a primary duty of management of the enterprise in which the employee is employed or of a customarily recognized department or subdivision thereof;" (3) regularly directs two or more employees; and (4) has "authority to hire or fire other employees or whose suggestions and recommendations as to the hiring, firing, advancement, promotion, or any other change of status of other employees are given particular weight." 29 C.F.R. § 541.100(a)(1)-(4); *see Rainey v. McWane, Inc*., 552 F. Supp. 2d 626, 629 (E.D. Tex. 2008). The parties agree that plaintiff's weekly earnings as a shift supervisor exceeded $455.00, and, thus, the first element is not in dispute. The remaining three elements are hotly contested, and are the subject of the balance of this Memorandum Opinion.

 A.  *Plaintiff's Duties as a Shift Supervisor*

   As Shift Supervisor, it was plaintiff's "primary duty" to "oversee the shift and make sure everything ran smoothly." (Burson Dep. 109.) Shift supervisors were responsible for the productivity of their shift (*Id*. 45-47), directing the work of the press operators (*Id*. 46, 60, 75, 132), and redirecting the work if production needs changed or a machine malfunctioned during the shift.[5] (*Id.* 75, 132.)

---

[4] Plaintiff also offers evidence to show that the position of shift supervisor did not fall within the administrative and professional exemptions, but Valley Forge makes clear that it is relying solely on the executive exemption. (*See* Doc. No. 38, Def. Opp. to Pl. Mot. PSJ at 1.)

[5] Shift supervisors also addressed staffing issues as they arose on their respective shifts. All requests for vacations went through the shift supervisors, and it fell to the supervisors to adjust the schedules when employees called in sick. (*Id.* 86, 111-13, 187.)

Shift supervisors were also tagged with the responsibility of ensuring the safety of their employees, by advising new employees of the company's safety policies and instructing press operators in the safe way in which to handle their press. (*Id.* 73-4, 85-6, 189-90.) Plaintiff, along with other shift supervisors, initiated disciplinary proceedings against employees for violating company rules, and, in certain limited circumstances, could terminate certain workers on the spot. (*Id.* 135-47, 162.) They also fielded employee grievances and complaints. (*Id.* 165.)

Plaintiff was also actively involved in the interview process for new hires. He interviewed all potential new hires for his shift, and then made recommendations to Human Resources Manager Helen Tauscher as to which applicants should be hired. *(Id.* 64-65, 162-65.) He reported that his recommendations were followed more often than not. (*Id.* 65.)

Finally, shift supervisors prepared various documents and records for the company. They were responsible for recording and maintaining the daily production records, as well as monthly production spreadsheets. (*Id.* 51, 116-17.) Each supervisor also prepared performance appraisals for the employees on his shift, and recommended wage increases where merited. (*Id.* 28-29.)

In general, plaintiff contends that shift supervisors had no independent managerial authority, and that while they may have directed the work of the individuals assigned to their shifts, any decision-making was severely limited by company policy or procedure, or was eliminated entirely by plaintiff's immediate superior, Tom Verlihay. Indeed, it is plaintiff's position that while Verlihay's managerial authority properly

qualified him as exempt under the executive exemption, shift supervisors, in comparison, had little or no authority that would have warranted the same exemption.

> B.        *Plaintiff's Primary Duty was One of Management*

At the outset, plaintiff questions whether plaintiff's Shift D (or Yellow Team) can be considered a "customarily recognized department or subdivision." *See* 29 C.F.R. § 541.100(a)(2). It is plaintiff's position that the only recognized departments or subdivisions in defendant's facility are the four previously denoted departments, of which forging is one.

The regulations define a "department or subdivision" as any "unit with permanent status and a continuing function." 29 C.F.R. § 541.103(a). Plaintiff supervised the D Shift, which was one of the four subdivisions of the forging department. The four shifts were ongoing units with a permanent status and a continuing function. (Doc. No. 39, Ex. C, Tauscher Dep. 74; Ex. D, Verlihay Dep. 15.) Moreover, plaintiff testified that employees generally stayed on one shift and worked under one supervisor. (Tauscher Dep. 97-99.) As such, each shift constituted a separate subdivision of the forge department. The Court finds that, assuming that remaining elements are met, a shift supervisor could, as a matter of law, properly be classified as exempt under the executive exemption. *See, e.g., Jones v. ENSR Corp.,* 1997 U.S. App. LEXIS 16404, *10 (6th Cir. July 1, 2007) (even though field supervisor had a supervisor, his primary duty was managerial); *Beauchamp v. Flex-N-Gate LLC*, 357 F. Supp. 2d 1010, *10 (E.D. Mich. 2005) (production (or shift) supervisor properly treated as exempt under the executive exemption); *Masters v. City of Huntington*, 800 F. Supp. 363, 364 (S.D.N.Y. 1992) (shift

captain on each of three shifts at a firehouse managed a subdivision, even though all reported to the fire chief).

Turning to the question of plaintiff's "primary duty," the regulations define this term as "the principal, main, major or most important duty that the employee performs."  29 U.S.C. § 541.700(a).  Courts are directed to make the determination as to the employee's primary duty based on "all the facts in a particular case," *see Thomas*, 506 F.3d at 504.

Under the regulations, "management" work is exempt work. *See* 29 C.F.R. § 541.100. The regulations provide that "management" includes:

> activities such as interviewing, selecting, and training of employees; setting and adjusting their rates of pay and hours of work; directing the work of employees; maintaining production or sales records for use in supervision or control; appraising employees' productivity and efficiency for the purpose of recommending promotions or other changes in status; handling employee complaints or grievances; disciplining employees; planning the work; determining the techniques to be used; apportioning the work among the employees; determining the type of materials, supplies, machinery, equipment or tools to be used or merchandise to be bought, stocked and sold; controlling the flow and distribution of materials or merchandise and supplies; providing for the safety and security of the employees or the property; planning and controlling the budget; and monitoring or implementing legal compliance measures.

29 C.F.R. § 541.102.

Plaintiff contends that his role in the hiring and interviewing of potential new hires to his shift was severely restricted because he was given a list of candidates from the Human Resources Manager, and that he was only permitted to interview employees seeking temporary positions. The record demonstrates, however, that all employees at Viking Forge are hired first as temporary employees. (Burson Dep. 23-25.) Once the applicant was brought on as a temporary employee, the shift supervisor would

11

prepare a written evaluation of his work and make a recommendation as to whether he should be offered a permanent, full-time position with the company. (Burson Dep. 163-164.)  Plaintiff reported that his recommendations as to who should be extended full-time employment were generally followed. (Burson Dep. 164.)

Plaintiff also maintains that he did not have independent authority to act with respect to several other managerial tasks Specifically, plaintiff highlights the following facts: the safety training he provided the press operators on his shift was dictated by company policy (Burson Dep. 72-73); the performance appraisals were prepared from a standardized form, and supervisors merely "checked boxes"[6]; plaintiff did not have the authority to stray from the steps in company's progressive discipline policy (Tauscher Dep. 35); and plaintiff was not responsible for creating a production schedule for his shift (Burson Dep. 47-8, 107-08).

"Nothing in the governing regulations or relevant case law requires that a supervisor must have unfettered discretion in the performance of his management duties in order to be deemed an 'executive.'" *Beauchamp*, 357 F. Supp. 2d at 1017. *See Thomas*, 506 F.3d at 507. The fact that the training plaintiff was to provide his press operators and the discipline he was to administer was governed by existing company policies and the fact that, like many companies, Viking Forge used a standardized form for its performance appraisals, does not transform plaintiff's duties into ones that are not managerial in nature. *See, e.g., Thomas,* 506 F.3d at 507 (company's governing standard

---

[6] The record shows that shift supervisors do more than simply "check boxes." While the company uses a standardized pre-printed form, the shift supervisor is expected to list goals for the employee to attain, along with suggestions for achieving those goals. (Burson Dep., Exs. 26, 40.) The shift supervisor would then go over the evaluation in a face-to-face meeting with the employee. (Burson Dep. 28-29.)

operating procedures did not eliminate her discretion as a manager); *Rainey*, 552 F. Supp. 2d 626, 631 (E.D. Tex. 2008) (existence of company rules and procedures did not change the nature of a supervisor's management duties); *Mitchell v. Abercrombie & Fitch, Co*., 428 F. Supp. 2d 725, 742-43 (S.D. Ohio 2006) (company's procedures and policies regarding store operations did not remove managerial authority from assistant store managers).  Indeed, as the court observed in *Donovan v. Burger King Corp*., 672 F.2d 221, 226 (1st Cir. 1982), "ensuring that company policies are carried out constitutes the very essence of supervisory work." *See Beauchamp*, 357 F. Supp. 2d at 1017.

As for the creation of production schedules, the record shows that defendant delegated this responsibility to Scott Morse. Morse was employed as the Materials Manager, and he set the production schedules for the entire facility. (Burson Dep. 47-8.) Of course, dictating production schedules is not one of the managerial tasks listed in 29 C.F.R. § 541.102. Further, if the fact that the company chose to centralize this task in one person was determinative, then no other managerial employee, including Verlihay, whom plaintiff concedes is exempt under the executive exemption, would qualify for the executive exemption. Regardless of who set the production goals, however, plaintiff admits that it was his responsibility as shift supervisor to ensure that his shift met these expectations.[7] (Burson Dep. 45-6.)

---

[7] Plaintiff also takes issues with defendant's representation that shift supervisors were responsible for maintaining production records, noting that plaintiff "simply entered onto a computer program production numbers that had been relayed to him by press operators." (Pl. Brief in Opp. at 13.) Plaintiff suggests, without any support, that this is "commonly known as 'data entry' work, which is clearly not an executive responsibility." (*Id.*) The record shows, however, that shift supervisors maintained production logs (Burson Dep. 102), and even prepared spread sheets of their monthly production reports. (Burson Dep. 115.) Burson also admits that he tallied the monthly production totals. (Burson Dep. 116-17.)

While plaintiff admits that he "arguably" directed the work of the night shift, he insists that many managerial decisions were taken from him by Verlihay. For example, he notes that Verlihay would dictate how he was to train his press operators or how he was to attempt to improve their performance (Doc. No. 39, Ex. 8, email from Burson to Verlihay), he had to call Verlihay before he could send someone home if production needs were met or a press had become inoperable (Burson Dep. 59-60), and he was not allowed to set work schedules for his press operators (Burson Dep. 59).

The fact that plaintiff had a manager who retained control over certain management decisions and dictated how other decisions were to be made did not undermine his authority to run his shift on a daily basis.[8] "Active supervision [] do[es] not eliminate the day-to-day discretion of the on-site manager." *Murray v. Stuckey's Inc*., 50 F.3d 564, 570 (8th Cir. 1985). Even in situations where a supervisor, himself, is subjected to the close supervision of his superior, courts have routinely found that the supervisors responsible for the daily activities of their subordinates are vested with enough discretionary power and freedom from supervision to qualify for the executive exemption. *Mitchell*, 428 F. Supp. 2d at 743 (rejecting argument that supervisor was merely complying with directives from higher level management); *see, e.g., Thomas*, 506 F.3d at 507 ("Even though [supervisor's] discretion was somewhat circumscribed by her district manager's supervision [...] she daily exercised discretion over matters vital to the

---

[8] As the court observed in *Kastor*, "If final decision-making authority were the test for determining whether a person was an executive or administrative employee, one would rarely, if ever, qualify as such an employee under the regulations. A president or chief executive officer of a company could say that he does not have final decision-making authority because he is only authorized to carry out the policies set by the board of directors, and the board of directors is free to review and veto his decisions." *Id*. at 868.

success of her station."); *Kastor v. Sam's Wholesale Club*, 141 F. Supp. 2d 862, 868 (N.D. Tex. 2001) (the fact that a manager had to obtain approval from time to time did not undermine his authority as a supervisor); *Haines v. Southern Retailers, Inc*., 939 F. Supp. 441, 450 (E.D. Va. 1996) (manager who could not hire, fire, or discipline without approval from her superior's approval still retained enough discretion over day-to-day activities to warrant the executive exemption).

With respect to work schedules, it is clear that plaintiff was still responsible for the daily issues that arose on his shift. Burson determined who would work on each press based on the individual's ability to operate the machines. (Burson Dep. 46.) If a line went down, plaintiff would move the press operator to another machine (Burson Dep. 75, 132), or redirect his operator to a cleaning task (albeit from a list of tasks) (Burson Dep. 60). In addition, all requests for vacations went through him, and he was responsible for adjusting work schedules if someone called in sick. (Burson Dep. 86, 111-13.) He was also the person responsible for getting volunteers to work overtime, when needed. (Burson Dep. at 86.) Certainly, plaintiff was correct when he testified in his deposition that he was responsible for the daily functioning of his shift.[9] (*Id*. at 109.)

Ultimately, the Court finds unpersuasive plaintiff's attempt to minimize his management of the employees on his shift. *See Kastor*, 131 F. Supp. 2d at 868. Plaintiff interviewed and hired employees, made adjustments to the shift's work schedule as needed, decided whether to grant vacation requests, evaluated his employees

---

[9] Plaintiff cites to one situation where he was "scolded" by Verlihay for agreeing to switch one press operator from Shift D to one of the day shifts. (Burson Dep. 186-187.) Verlihay testified, and plaintiff does not dispute, that the trade went through, but that Verlihay was merely upset that Burson had made the switch with a day shift press operator with considerably more seniority than plaintiff's Shift D employee. (Verlihay Dep. 66-7.) Verlihay considered the trade to be "one-sided." (*Id*. at 66.)

performances, trained his employees in proper safety procedures, administered discipline, and resolved employee complaints. "While [his] discretion was by no means unfettered and abounding, []he exercised discretion over important managerial functions on a sufficiently frequent basis to support a finding that management was [his] primary duty."[10] *Thomas*, 506 F.3d at 507.

C.        *Plaintiff Regularly Directed Two or More Employees*

To satisfy the second element of the executive exemption, defendant points to plaintiff's deposition, wherein he testified that, at any given time, there were between 10 and 18 press operators on his shift. (Burson Dep. 22.) Further, defendant highlights the fact that Burson conceded that he directed the work of these press operators (Burson Dep. 46, 75, 132). Plaintiff takes issue with this, suggesting that it was really Verlihay who was the supervisor for the employees on Shift D, as well as the press operators on the other three shifts.

As discussed above, the record amply demonstrates that plaintiff was primarily responsible for the management of Shift D. In fact, plaintiff, himself, admitted that he was ultimately responsible for everything that happened on his shift. (Burson Dep. 109.) Even if his discretionary authority was compromised, in part, by Verlihay's role as plaintiff's superior, it is undisputed that plaintiff was the only management employee in

---

[10] Plaintiff also underscores the fact that he was not privy to wage information of his employees (Burson Dep. 31; Verlihay Dep. 54), as well as the fact that plaintiff did not have access to the personnel files of employees on his shift. (Verlihay Dep. 55.) However, neither having access to personnel files nor being privy to a subordinate's salary is listed in the regulations as an activity of management. *See* 29 C.F.R. § 541.102. Nonetheless, setting and adjusting rates of pay is, indeed, one of the enumerated management activities, and the record clearly establishes that plaintiff regularly recommended raises for the workers on his shift, and that these recommendations were generally followed to the letter or with minor modifications. (Verlihay Decl. ¶¶ 8-12.)

the facility between the hours of midnight and 5:00 am. (Burson Dep. 36.) For at least a portion of each shift, plaintiff was the only person who could direct the activity of the employees on Shift D. The mere fact that plaintiff also had a supervisor does not negate the fact that he was in charge of his shift. Contrary to plaintiff's suggestion that Shift D ran itself, with Verlihay remotely controlling the decision-making process, the competent summary judgment evidence establishes that plaintiff directed two or more employees. *See Kastor*, 131 F. Supp. 2d at 868 (rejecting bakery manager's attempt to characterize the bakery department as "essentially running itself").

D.      *Plaintiff's Recommendations Were Given Particular Weight*

Finally, the Court considers whether plaintiff had the "authority to hire or fire other employees or their suggestions and recommendations as to the hiring, firing, advancement, promotion, or any other change of status are given particular weight." 29 C.F.R. § 541.100(a)(4). Under the regulations, "[a]n employee's suggestions and recommendations may still be deemed to have "particular weight" even if a higher level manager's recommendation has more importance and even if the employee does not have authority to make the ultimate decision as to the employee's change in status." § 541.105. *See Rainey*, 552 F. Supp. 2d at 631-32.

The governing regulation provides, in part:

> To determine whether an employee's suggestions and recommendations are given "particular weight," factors to be considered include, but are not limited to, whether it is part of the employee's job duties to make such suggestions and recommendations; the frequency with which such suggestions and recommendations are made or requested; and the frequency with which the employee's suggestions and recommendations are relied upon. Generally, an executive's suggestions and recommendations must pertain to employees whom the executive

17

customarily and regularly directs. It does not include an occasional suggestion with regard to the change in status of a co-worker. […]

29 C.F.R. § 105.

Plaintiff identifies specific examples where his recommendations were not followed by Verlihay. He cites to a situation where plaintiff observed a Viking Forge employee from a different department who was visibly intoxicated and recommended that the employee be discharged but the employee was not terminated. (Verlihay Dep. 80.) On another occasion, plaintiff made a recommendation that an employee be terminated for dishonesty, but, instead, the employee was transferred to plaintiff's department.[11] (*Id*. 80-81.)

Notwithstanding these isolated incidents, the record clearly demonstrates that plaintiff was intimately involved in the interviewing and hiring process, and that his recommendations as to initial hires were generally followed. (Burson Dep. 66.) Similarly, plaintiff concedes that his recommendations regarding the extension of offers of full-time employment were also followed more often than not. (Burson Dep. 163-64.) His recommendations as to salary increases were also generally followed. (Burson Dep. 28-9, 43; Verlihay Decl. ¶ 7.) Plaintiff even made recommendations as to which employees should be elevated from press operator to floor person, and the record shows that such

---

[11] Other recommendations that were not followed included: a proposed change regarding the handling of a certain tool (Burson Dep. 76-77), and a change to the policy regarding the cleaning of another tool (Burson Dep. 79). Plaintiff also claims that his recommendation to change the company's progressive disciplinary policy to permit supervisors to discharge an employee immediately without following the progressive discipline steps was rejected. He did not, however, append the record cite to his opposition brief. (*See* Brief in Opp., p. 17.) It is worth noting that plaintiff failed to append to his motion and opposition brief several documents and deposition pages that he relied upon to support his position. (*See* Doc. No. 37, at 2 missing defendant's response to plaintiff's interrogatories; Doc. No. 39, at 3 missing defendant's response to plaintiff's interrogatories, at 10 missing Burson Dep. 65, at 12 missing Burson Dep. 35, and at 14 missing Burson Dep. 33, 79.) On summary judgment, the Court need not "search the entire record to establish that it is bereft of a genuine issue of material fact." *Street*, 886 F.2d at 1479-80.

recommendations carried particular weight with Verlihay.[12] (Burson Dep. 23-27; Verlihay Decl. ¶ 15.)

As for discipline, it is undisputed that shift supervisors initiate the disciplinary process, generally by first issuing a verbal warning to the employee. (Burson Dep. 74.) In some instances, however, shift supervisors have the authority to discharge a temporary employee, and, even permanent employees, though generally the supervisor would have to speak with Verlihay or Tauscher before terminating a permanent employee. (Burson Dep. 142-46.) Plaintiff acknowledged that he terminated several employees without prior approval from Verlihay (Burson Dep. 142, 145-46.)

Defendant's hiring and disciplinary processes are similar to those in *Beauchamp*. There, supervisors evaluated new hires to determine whether they should continue to work for the company. *See id*. 1016. Additionally, in *Beauchamp*, the supervisors typically initiated the disciplinary process that would lead to an employee's discharge. *Id*. The court found this to be enough to comport with the regulatory requirement that the executive's recommendations and suggestions as to hiring and firing were given particular weight. *Id. See Rainey*, 552 F. Supp. 2d at 632 (similar hiring and progress discipline process initiated by supervisor was sufficient to satisfy the "particular weight" requirement). The Court finds the reasoning in *Beauchamp* and *Rainey* persuasive and holds that defendant has satisfied the fourth and final requirement of the

---

[12] Plaintiff insists that the move from press operator to floor person was not a promotion, but plaintiff admits that the floor person was only required to run a press when needed, and she had other duties, including assisting with the interview process. (Burson Dep. 25.)

19

executive exemption.[13]

Plaintiff also makes much of the fact that Viking Forge paid plaintiff an hourly wage, with the right to overtime, when he first became a manager, but then later paid him a straight salary.[14] However, the law does not require an employer to pay an otherwise exempt employee overtime. The only requirement is that if the employee does not meet one of the exemptions, the employer must pay the employee overtime. 29 U.S.C. § 207(a)(1). The fact that defendant initially agreed to permit plaintiff to receive additional compensation for hours worked beyond a 40 hour work week does not later preclude the employer from restricting his pay to a straight salary.[15]

When Burson became a supervisor, he met the duties requirements of 29 C.F.R. § 541.100(a)(2), (3), but did not qualify for the exemption because Viking Forge elected to pay him an hourly wage. Burson was, of course, the beneficiary of that

---

[13] Plaintiff also claims that the appraisal of employees was not managerial in nature because it was not for the purpose of recommending promotions. In reaching this conclusion, plaintiff relies on Tauscher's deposition testimony that "I wouldn't really look at a supervisor to recommend a promotion." (Tauscher Dep. 36.) This testimony was taken out of context. Instead, the testimony unfolded as such:

> Q. And would you agree that promotions, that [supervisors] would not have autonomy with respect to promotion decisions, correct?
> A. *The opportunities for promotion are rare*, so I would not really look at a supervisor to recommend a promotion."

(Tauscher Dep. 36, emphasis added.) While promotions did not occur with any frequency at Viking Forge, a shift supervisor's appraisal was relied upon for offering full-time employment to temporary employees, approving wage increases, and elevating an employee from a press operator to a floor person. (Burson Dep. 24-29, 162-65; Verlihay Decl. ¶ 15.)

[14] Plaintiff also maintains that one other shift supervisor, Shannon Overall, was classified as an hourly, nonexempt employee, with the right to overtime pay, and cites to defendant's response to plaintiff's interrogatories and Overall's affidavit. (Pl. Brief in Opp. at 3.) Unfortunately, plaintiff failed to append defendant's responses to plaintiff's interrogatories to his motion, and Overall's affidavit makes no reference to the manner in which he was paid. (*See* Doc. No. 37, Ex. 7.)

[15] Reiterating his belief that the change in pay was precipitated by his request to be paid a salary, plaintiff underscores the fact that an employee may not bargain away his rights under the FLSA. *See Crawford v. Lexington-Fayette Urban County Gov't*, 2008 WL 4724499 (E.D. Ky. Oct. 23, 2008). The record, however, does not support this argument. Plaintiff requested to be placed on a salary immediately upon being made a shift supervisor (Verlihay Dep. 15), but the switch to a straight salary did not take place until 8 months later. (Burson Dep. 90.)

decision. When Viking Forge changed Burson's compensation to a straight salary, Burson satisfied the salary basis test recognized in § 541.100(a)(1). Because now all of the requirements for exemption were met, Viking Forge was entitled to treat Burson as exempt.

Viking Forge has established that each of the four factors supports its designation of the shift supervisor position as exempt. Therefore, defendant has satisfied its burden on summary judgment of demonstrating that Burson was qualified as a bona fide executive employee under FLSA.

**IV.      Conclusion**

For all of the foregoing reasons, defendant's motion for summary judgment (Doc. No. 35) is **GRANTED**, and plaintiff's motion for partial summary judgment (Doc. No. 37) is **DENIED**. This case is dismissed.

**IT IS SO ORDERED**.

Dated: August 27, 2009

**HONORABLE SARA LIOI**
**UNITED STATES DISTRICT JUDGE**